## CECIL HOWELL v. STATE.

163 So. 691.
Opinion Filed October 29, 1935.

*DeHoff & DeHoff,* for Plaintiff in Error;

*Cary D. Landis,* Attorney General, and *Roy Campbell,* Assistant, for the State.

PER CURIAM.—Howell was convicted of the offense denounced by Chapter 8596, General Laws of Florida, Acts 1921, now Section 7552 C. G. L., 5409 R. G. S., as amended. The principal issue at the trial of this case was whether or not the State established beyond a reasonable doubt, as it

was required to do under the law in order to sustain a conviction, the alleged previous chaste character of the prosecuting female witness who was unmarried and was under the age of eighteen years at the time plaintiff in error was accused of having had unlawful carnal intercourse with her in violation of the above cited statute, which punishes as a felony any unlawful carnal intercourse with unmarried *persons* (either male or female) under the age of eighteen years, if such *persons* are at the time of such carnal intercourse, not only under age, *but* of previous chaste character as well. Blount v. State, 102 Fla. 1100, 138 Sou. Rep. 2; Deas v. State, 120 Fla. 839, 161 Sou. Rep. 729.

A careful review of the testimony in this case adduced by the State to prove the alleged previous chaste character of the prosecuting female at the time of the alleged unlawful carnal intercourse shows that the evidence is of such unsatisfactory character that a majority of the Court are of the opinion the ends of justice will be best subserved by the award of a new trial. Woodward v. State, 113 Fla. 301, 151 Sou. Rep. 509, and authorities cited therein.

Reversed for a new trial.

WHITFIELD, C. J., and TERRELL and DAVIS, J. J., concur.

BROWN and BUFORD, J. J., dissent.

BUFORD, J. (dissenting).—I find myself unable to agree with conclusions reached in this case by my associates.

In Williams v. State, 92 Fla. 125, 109 Sou. 305, we said:

"Chaste is defined as meaning 'pure from all unlawful commerce of the sexes'; applied to persons before marriage it signifies pure from all sexual intercourse. Previous chaste character as used in the law in cases of this kind means, 'actual personal virtue and not reputation.' 2 Words and Phrases, p. 1092, and cases there cited.

"The witness having testified that no one else had ever had sexual intercourse with her, this was proof of previous chaste character in the manner in which the law contemplates that personal chastity—actual character—shall be proven."

In Blount v. State, 102 Fla. 1100, 138 Sou. 2, we said:

"The statute is directed against seduction of unmarried persons of previous chaste character under eighteen years of age. Formerly such statutes in this State were aimed at the masculine gender of the genus. Holton v. State, 28 Fla. 303, 9 South. Rep. 716. The statute has undergone some verbal changes in that particular. Chapter 8596, Laws 1921, but its purpose is still the protection of persons of immature age from licentiousness. Under the present statute the guilty person commits a felony; formerly the offense was a misdemeanor. See Sec. 3598, Rev. Stats., 1892."

In Deas v. State, 120 Fla. 839, 161 Sou. 729, we said:

"In this case the defense was based on an asserted lack of previous chaste character on the part of the prosecuting female when the defendant first had sexual intercourse with her as she testified at the trial. To rebut the testimony of the prosecuting witness as to her previous chaste character, that is, of her undefiled virginity, prior to her initial indulgence with the defendant, the defendant attempted to introduce in evidence proof of the general reputation of the prosecuting female as an unchaste girl in the community in which she was living. The evidence was ruled out, and the defendant excepted.

"Where the defense does not consist of a complete denial of any and all acts of unlawful sexual intercourse as charged (in which case proof of previous chaste character of the prosecuting female is only formally or technically required,

like proof of venue, etc.), but is predicated on the express or implied admission that sexual intercourse did take place, but was with a subject not within the definition of the statute as a person of previous chaste character, evidence tending, to show the common and general unchaste reputation of the prosecuting female in a case like this should be received as tending to throw light on the veracity of the testimony óf the witness that her own previous character was that of a chaste female, when such proof is confined to a time at or prior to the alleged unlawful act of sexual intercourse with her upon which the State relies for a conviction. State v. Patterson, 88 Mo. 88, 57 Am. Rep. 374. This is in consequence with the holding in Prior v. Oglesby, 50 Fla. 248, 39 So. 593, wherein it was held that whatever evidence is offered which will assist the jury in knowing which party speaks the truth of the issues in a case, should be regarded as relevant and received, when to admit it does not override other formal rules of evidence."

Measured by the rule stated in either of these cases, I find nothing in the record to warrant the reversal of the judgment upon the theory that the evidence of the previous chaste character of the girl involved in the case is so unsatisfactory as not to have been entitled to credence by the jury.

The girl was 13 years of age and unmarried. She lived at the home of her parents. The evidence is conclusive that there had been no complaint about her misconduct, nor any observation of misconduct on her part by the county probation officers or the city officers of the City of Jacksonville until the time when this unfortunate affair occurred. The man involved in the case, the defendant here, was 40 years of age; he had a family; one daughter who was about the same age of the girl involved here. This

daughter and this girl were associates and playmates. They visited the home of one another and associated together. The State introduced a police-woman of the City of Jackville, Mrs. Mattie G. Tipton. Mrs. Tipton testified that she had never had any conversation with Nell Brown nor any investigation concerning her until two or three days after the matter involved here occurred. The sum and substance of her testimony was: that she first met Nell Brown at the police station and there she also met the defendant. There Nell Brown told her about going to a rooming house on Pearl Street with the defendant Howell on the night of the 12th of January and spending about two hours in bed there with him. That at that time he did not have sexual intercourse with her. That on the night of the 18th of January he took her to the same rooming house and there they spent the entire night together and the offense was committed as here charged. She also testified that she had some report about the girl going to some other house and that she had been out in the park, but there is absolutely no evidence by this police-woman that there was any immoral conduct on the part of the girl prior to her going to the rooming house on the 12th of January with the defendant.

The same is true of the testimony of Capt. Cannon of the police force and of Mrs. F. O. Wilder, an Assistant Probation Officer.

The mother and father of the girl both testified to her previous chaste character.

The only witnesses who have been found to give testimony adversely to the previous chaste character of this girl were the defendant himself and his daughter, who was the playmate of the girl whose testimony amounted to no more than an insinuation of previous bad conduct.

The defendant testified that he had not had sexual intercourse with the girl, though he admitted that he went to the rooming house and hired a room and stayed in the room with her a while, putting his hands on her body, the night of January 12th. That he took her back to the same rooming house on the night of January 18th, hired a room and spent the entire night with her there. So it is that he did not base his defense on the previous unchastity of the child, but his defense was that he did not commit the act. The jury did not believe his statement and they would have been credulous, indeed, to have believed it. In his testimony he purported to relate things that had been told him by this girl when he was spending the night in the room with her which would indicate that she was not of previous chaste character. The jury very probably did not believe that statement. He testified, when asked this question, "Did you tell Capt. and Mrs. Tipton over at the police station that you had intercourse with Nell Brown in that hotel at 22 Pearl Street on the night of the 18th of January of this year?" he answered, "To a certain extent, for reasons I did." Question: You did tell them that? Answer: I did not give them a plain, satisfactory statement of it because when Mr. Brown found out his girl had stayed out all night he came to my house and knocked at the door and I answered and he said, 'I would like to see you,' and I said, "All right, what is on your mind?' "

Now Mrs. Tipton, in her testimony, said:

"Mr. Howell made the statement that he was in love with this girl and had been for about four months, and for the last three weeks prior to this visit to the hotel the temptation had become so great that he could not resist petting and making love to her and that he loved the girl better than anything he had ever seen in his life, and he wouldn't do

anything to hurt her, and he admitted that he had this inter-course with her, and that he was sorry for it."

Capt. Cannon in his testimony was asked the following question:

"How long had Mr. Howell been sitting in the office with you three before he made any statement?"

To which he answered:

"Just a few minutes, as soon as he came, and we went to discussing it, and I told Howell what Nell's statement was, and then he made his statement himself, as to what had happened."

Capt. Cannon was then asked this question:

"Do you remember that he said, "Well, since he has confessed, I might as well do the same,' or 'Since she had told her story I might as well do the same?"

To which he answered:

"There was something like that said. I don't recall just the language on that; I know that he said he didn't think it would make much difference. I asked him if that had been the first time and he said, 'I don't think that will make much difference'; said that twice, 'Woudn't make much difference,' but he said she did spend two hours in the room with him on the Saturday night before."

Capt. Cannon also testified as follows:

"I brought both of them to my office and we all sat down and discussed it and Howell said he had had her up to this room twice, and that he had had an intercourse with her, and I asked him, in his opinion, was he the first man who ever went with her, and he said he didn't think he was, and I asked him why did he take her up there and he said that she had been visiting in his home and that she had tempted him, and I asked him how he approached her on the subject, and he said he asked her would she let him go further

with her, and that the first night was on Saturday night that they went to this rooming house and stayed about two hours, and that they had arranged at that time to come back there on Friday night, after she got out from school Friday afternoon, and that they would go back up there and spend the night, Friday night, which they did, and she went home Saturday morning, and after she had got home there had been some trouble in the family as to her staying out all night, and Brown sent for him, or brought him over to his home and then called the police, and he was arrested from Brown's house and brought to the police station."

When questioned about the girl having been sent to Fla. Industrial School for Girls at Ocala, Mrs. Wilder, the assistant probation officer, testified as follows:

"Q. Mrs. Wilder, what did you do with Nell Brown after the preliminary hearing?

"A. What did I do with her after the prelimnary hearing?

"Q. Yes, Ma'am, after you held your examination in Juvenile Court?

"A. The Court sent her to Ocala.

"Q. Based on the testimony she made down there in the Juvenile Court?

"A. Yes, sir, feeling that it was for her best interests at that time.

"Q. Wasn't that best feeling centered around the fact of the statement that she made down there, or was it because of her character, from the examination that you made?

"A. We had no complaints about Nell Brown previous to that time, that was our first contact with the child.

"Q. Did you make an investigation before the preliminary hearing?

"A. With reference to what?

"Q. With reference to her character.

"A. A small, not a long or lengthy examination.

"Q. Well, based on the evidence that she gave down there and this investigation, you thought it was best to send her to Ocala?

"A. Based on her own statement as to this experience, we did not think that it was to her best future for her to go back into public school after this experience. The Court makes the Order."

This is the only explanation in the record and it certainly does not reflect upon the previous chaste character of the girl, Nell Brown.

It is true that the record shows that Nell Brown was not entirely ignorant of the possibility of sexual relations and that she had learned something about instrumentalities commonly used in connection therewith. But, her explanation as to the sources of her information, that a part of it was acquired from things she had found in her father's dresser at home and a part from what girls had told her at school, appears to be not only reasonable but highly probable.

I do not think the statute was intended for the protection of only those of tender years whose virtue can only be defiled by a commission of rape, and, therefore, that this girl knew the purpose for which the defendant was taking her to a rooming house, and that she was willing to go with him for that purpose, constitutes no defense and is nothing to his credit.

The father of the girl is to be commended for overcoming the impulse to take the law into his own hands and to reap personal vengeance on the defiler of his daughter. The record shows that he seriously considered doing just that,

but did desist, and turned the matter over to the courts, that justice might be accomplished.

I think the judgment should be affirmed.

BROWN, J., concurs.